UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LEONTINE K. ROBINSON,<br><br>Plaintiff,<br><br>v.<br><br>CHILDREN'S HOSPITAL BOSTON,<br><br>Defendant. | Civil Action No. 14-10263-DJC |

## MEMORANDUM AND ORDER

**CASPER, J.**                                                                                                    April 5, 2016

**I.    Introduction**

Plaintiff Leontine K. Robinson ("Robinson") alleges that Children's Hospital Boston (the "Hospital") violated 42 U.S.C. § 2000e-2 and Mass. Gen. L. c. 151B when the Hospital terminated her after she refused a flu vaccination because of her religious beliefs. D. 1. The Hospital now moves for summary judgment. D. 45. For the reasons stated below, the Court ALLOWS the motion.

**II.   Standard of Review**

The Court grants summary judgment where there is no genuine dispute on any material fact and the undisputed facts demonstrate that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A fact is material if it carries with it the potential to affect the outcome of the suit under applicable law." OneBeacon Am. Ins. Co. v. Commercial Union Assur. Co. of Canada, 684 F.3d 237, 241 (1st Cir. 2012) (citation and internal quotation marks omitted). The moving party bears the burden of demonstrating the absence of a genuine issue of

1

material fact. Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000). If that party meets its burden, the non-moving party may not rest on the allegations or denials in her pleadings, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986), but "must, with respect to each issue on which she would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in her favor." Borges ex rel. S.M.B.W. v. Serrano–Isern, 605 F.3d 1, 5 (1st Cir. 2010). "As a general rule, that requires the production of evidence that is 'significant[ly] probative.'" Id. (quoting Anderson, 477 U.S. at 249) (alteration in original). Although the Court gives the nonmoving party "the benefit of all reasonable inferences," that party "cannot rest on 'conclusory allegations, improbable inferences, or unsupported speculation' to defeat a motion for summary judgment." Barry v. Moran, 661 F.3d 696, 703 (1st Cir. 2011) (quoting Welch v. Ciampa, 542 F.3d 927, 935 (1st Cir. 2008)).

### III. Factual Background

The following material facts are drawn from the Hospital's statement of undisputed material facts, D. 47, and Robinson's responses to that statement, D. 51-1.[1]

---

[1] Robinson disputes the Hospital's reliance on Dr. Sandora's affidavit, D. 47-1, on the grounds that the doctor, board certified in pediatrics and pediatric infectious diseases who serves as the Hospital's Epidemiologist and Medical Director for Infection Prevention and Control, lacks personal knowledge or the foundation to provide expert testimony regarding the flu vaccine. See, e.g., D. 51-1 ¶ 2. The Court disagrees where the affidavit reveals that Dr. Sandora's statements are based on personal knowledge and/or there is sufficient basis for his expert opinion. Velázquez-García v. Horizon Lines of Puerto Rico, Inc., 473 F.3d 11, 18 (1st Cir. 2007) (stating that where an affidavit contains relevant first-hand information, it is competent to support summary judgment, even if self-serving); Fraser & Wise, P.C. v. Primarily Primates, Inc., 966 F. Supp. 63, 69 (D. Mass. 1996) (noting that "[t]o the extent an affiant is a qualified expert, her testimony need not be based on personal knowledge"); Fed. R. Civ. P. 56(c)(4). Robinson also objects to some of the Hospital's statements of fact, but fails to cite to the record to show a disputed issue as to that statement of fact exists. See, e.g., D. 51-1 ¶ 17 (Robinson's response of "Objection, unsupported" with no record citation). Unless otherwise noted, the Court deems those facts admitted. Cochran v. Quest Software, Inc., 328 F.3d 1, 12 (1st Cir. 2003); D. Mass. Local R. 56.1 (requiring that a "party opposing the motion shall include a concise statement of the material facts of record as to which it is contended that there exists a

### A.     The Hospital Implements a Flu Vaccination Policy

The Hospital is a non-profit teaching hospital affiliated with Harvard Medical School. D. 47 ¶ 1. The Hospital's patient population includes some of the most critically ill infants, children and adolescents in the world. Id. ¶ 2. Even in healthy infants and children, the influenza virus can be fatal and the risk of infection and fatality is higher within the Hospital's patient population. Id. ¶ 4.

The American Academy of Pediatrics strongly recommends the vaccination of hospital personnel. Id. ¶ 14. In 2015, it reaffirmed its stance, stating that mandatory immunization of health care workers is ethical and necessary to benefit the health of employees, patients and community members. Id. ¶ 15. Other medical organizations also advocate for mandatory annual influenza immunizations for health care workers. Id. ¶ 16. They include the Centers for Disease Control and Prevention, American Academy of Family Physicians, American Hospital Association, Society for Healthcare Epidemiology of America, Infectious Diseases Society of America, Pediatric Infectious Diseases Society, Association for Professionals in Infection Control and Epidemiology Inc. and American Public Health Association. Id.

The Massachusetts Department of Public Health ("DPH") strongly encourages vaccination among personnel who work at Massachusetts hospitals. Id. ¶ 8. In 2010, to encourage vaccination, DPH began to require hospitals to track and report the influenza vaccination rates of all hospital staff. Id. ¶ 9. DPH also required hospitals to offer the vaccination to all personnel for free. Id. ¶ 10.

---

genuine issue to be tried, with page references to affidavits, depositions and other documentation" and noting that "material facts of record set forth in the statement required to be served by the moving party will be deemed for purposes of the motion to be admitted by opposing parties unless controverted by the statement required to be served by opposing parties").

In response to DPH's new policy, the Hospital decided in 2011 to require all persons who work in or access patient-care areas to be vaccinated against the influenza virus to achieve the safest possible environment and to ensure the highest possible care for its patients. Id. ¶¶ 11, 17. The Hospital's goal was to get as close to 100% of its health care workers vaccinated as possible. Id. ¶ 18. To achieve that goal, the Hospital's vaccination requirement extended not only to employees, but to anyone affiliated with the Hospital who accessed patient areas, including volunteers, contractors and health care providers with Hospital treating privileges. Id. ¶ 19.

Under the Hospital's policy, the only persons exempt from vaccination were those for whom the influenza vaccine posed a serious health risk. Id. ¶ 20; D. 51-1 ¶ 20. The Hospital did not exempt those who objected on religious grounds because it concluded that additional exemptions would increase the risk of transmission. D. 47 ¶¶ 21, 23; D. 51-1 ¶¶ 21, 23. The Hospital did accommodate individual requests based on religious concerns to receive a pork-free (gelatin-free) vaccine. D. 47 ¶ 22.

### B.   Robinson Refuses the Influenza Vaccine

Robinson has worked at the Hospital since 1995. D. 47 ¶ 24; D. 51-1 ¶ 24. She has been an administrative associate or served in a similar role in the emergency department. D. 47 ¶ 25; D. 51-1 ¶ 25. Robinson was typically one of the first Hospital employees to interact with patients and their family members when they arrived in the emergency department. D. 47 ¶ 26. Robinson handled intake and registration and affixed patient identification bracelets. D. 47 ¶¶ 27, 29; D. 51-1 ¶¶ 27, 29. These duties required her to touch and sit in close proximity to patients. D. 47 ¶¶ 28-29; D. 51-1 ¶¶ 28-29. Because of this close physical proximity, for patients with highly contagious illnesses, Robinson would affix their bracelets on their paperwork instead. D. 47 ¶ 30; D. 51-1 ¶ 30.

In July 2011, the Hospital announced that except for those exempt for medical reasons, all employees and others working in patient-care areas had to be vaccinated for influenza. D. 47 ¶ 33. In September 2011, the Hospital reminded its employees of the policy. Id. ¶ 36. Robinson received the reminder. Id. ¶ 37; D. 51-1 ¶ 37. Separately, that same month, Robinson received a tetanus vaccination. D. 47 ¶ 35; D. 51-1 ¶ 35.

On November 1, 2011, Robinson contacted Kevin Muhammed ("Muhammed"), who is associated with the Nation of Islam's Ministry of Health. D. 47 ¶¶ 38-39; D. 51-1 ¶¶ 38-39; D. 47-7. The Ministry of Health is a department within the Nation of Islam that deals with its followers' health concerns. D. 47 ¶ 40; D. 51-1 ¶ 40. Robinson requested a vaccination exemption letter and Muhammed sent her forms for her use. Id. ¶¶ 41-42.

On November 8, 2011, Robinson's supervisor Jason Dupuis ("Dupuis") reminded Robinson and others that the deadline to receive the influenza vaccine was December 1, 2011. Id. ¶ 43. Robinson responded that she was declining the vaccine on religious grounds. Id. ¶ 44. Dupuis replied that the only exemption was for medical reasons and referred Robinson to the Hospital's occupational health department for further information. Id. ¶ 45.

On November 15, 2011, Robinson emailed Muhammed to ask whether influenza vaccinations included pork byproducts. D. 47 ¶ 46; D. 51-1 ¶ 46; D. 47-10. Muhammed stated that some vaccines contained pork byproduct and suggested that Robinson get a list of the ingredients in the specific vaccine administered. D. 47 ¶ 47; D. 51-1 ¶ 47; D. 47-10.

**C.    Robinson Seeks an Alternative to the Vaccine**

On November 16, 2011, Robinson spoke with Lucinda Brown ("Brown"), the Hospital's Director of Occupational Health, about her objection to the vaccine. D. 47 ¶ 53. Robinson told Brown that she would not take the vaccine because she was Muslim and the vaccine had pork

5

byproduct.  Id. ¶ 54; D 47-11.  She also stated that she believed many vaccines are contaminated and she did not feel comfortable receiving the influenza vaccine.  Id. ¶ 60; D. 47-11.  Later, at her deposition, Robinson explained that in the same month she met with Brown, she separately learned that her religion had a moratorium on all vaccinations.  D. 47 ¶ 112; D. 51-1 ¶ 112.

Brown offered Robinson a non-gelatin influenza vaccine but Robinson declined it.  D. 47 ¶¶ 55-56; D. 51-1 ¶¶ 55-56.  Brown asked why Robinson was willing to take a tetanus vaccine in September 2011, but not the influenza one.  Id. ¶ 61.  Robinson responded that she had taken the tetanus shot because she was told that that vaccine was mandatory and that failure to take it would be grounds for termination.  Id. ¶ 62.  Brown told Robinson that the influenza vaccine was also mandatory and that the Hospital would terminate her if she refused.  Id. ¶ 63.  Brown, however, also stated that if Robinson found a position outside of patient care, she would not be required to take the influenza vaccine.  Id. ¶ 64.

A few days after the meeting, Christine Cadegan ("Cadegan"), a nurse in the occupational health department, reiterated that the Hospital could offer a pork-free vaccine and offered Robinson information about its contents.  D. 47 ¶¶ 57-58; D. 51-1 ¶¶ 57-58.  Robinson did not ask for a list of ingredients because she had no intention of taking the pork-free vaccine.  D. 47 ¶ 59; D. 51-1 ¶ 59.

On November 21, 2011, Dupuis reminded Robinson and others of the December 1, 2011 deadline.  D. 47 ¶ 65; D. 51-1 ¶ 65.  Robinson responded that she was declining the influenza vaccine because of her religious beliefs.  D. 47 ¶ 66; D. 51-1 ¶ 66.  She was also looking to transfer to another position outside of patient care and encouraged him to contact her if he knew of any positions.  D. 47 ¶ 66; D. 51-1 ¶ 66.  Dupuis replied he would see what he could find out and stated he was hopeful an amenable solution could be found.  D. 47 ¶ 67; D. 51-1 ¶ 67.

On December 1, 2011, the day of the deadline, Robinson told Cadegan that she had a bad allergic reaction to the influenza vaccine in 2007. D. 47 ¶ 68; D. 51-1 ¶ 68. Cadegan encouraged Robinson to submit medical documentation about her allergic reaction in case it supported a medical exemption. D. 47 ¶ 69; D. 51-1 ¶ 69. Cadegan granted Robinson a temporary medical exemption pending review of her medical records. D. 47 ¶ 70; D. 51-1 ¶ 70. On December 19, 2011, the occupational health department concluded that Robinson's medical history did not qualify her for a medical exemption. D. 47 ¶ 71; D. 51-1 ¶ 71.

On December 21, 2011, Robinson met with Carolyn Stetson ("Stetson"), the Hospital's Director of Employee Relations. D. 47 ¶ 72; D. 51-1 ¶ 72; D. 47-15. Robinson requested the opportunity to explore roles in non-patient-care areas of the Hospital. D. 47 ¶ 73; D. 51-1 ¶ 73; D. 47-15. Specifically, she asked for an interview for a medical record clerk position for which she had already applied. D. 47 ¶ 74; D. 51-1 ¶ 74; D. 47-15. Robinson also asked that she be permitted to use her accrued earned time from December 22, 2011 until February 3, 2012 to find employment outside the Hospital. D. 47 ¶ 75; D. 51-1 ¶ 75; D. 47-15.

During the meeting, Stetson called one of her employees and instructed her to assist Robinson's job search. D. 47 ¶ 82; D. 51-1 ¶ 82. That employee told Robinson that she would do whatever she could to help. D. 47 ¶ 84; D. 51-1 ¶ 84. The Hospital granted Robinson's request to use her earned time to look for another position. D. 47 ¶ 79; D. 51-1 ¶ 79. The Hospital also gave Robinson an opportunity to interview for the medical records clerk position, but Robinson was not hired for the position. D. 47 ¶¶ 85-86; D. 51-1 ¶¶ 85-86.

In the period after Robinson's request for an interview, there were no publicly posted positions outside of patient care for which Robinson was qualified. D. 47 ¶ 87; D. 51-1 ¶ 87. Robinson also did not know of any non-patient-care position for which she was qualified but that

7

were not publicly posted. D. 47 ¶ 88; D. 51-1 ¶ 88. Robinson did not apply for any other Hospital position after her request for an interview for the medical records position. D. 47 ¶ 89; D. 51-1 ¶ 89.

Because Robinson was unable to find another position by the end of her leave of absence, the Hospital offered her an additional two weeks of leave. D. 47 ¶ 90; D. 51-1 ¶ 90. Robinson accepted the offer. D. 47 ¶ 90; D. 51-1 ¶ 90. When the two-week period ended, the Hospital treated Robinson's termination as a voluntary resignation, which left her eligible to re-apply for other Hospital positions in the future. D. 47 ¶ 91; D. 51-1 ¶ 91.

## IV. Procedural History

Robinson filed this lawsuit on February 4, 2014. D. 1. She asserts two claims against the Hospital: (1) religious discrimination under 42 U.S.C. § 2000e-2 and (2) religious discrimination under Mass. Gen. L. c. 151B. Id. at 4-5. The Hospital has now moved for summary judgment. D. 45. The Court heard the parties on the motion and took the matter under advisement. D. 55.

## V. Discussion

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating against any employee on the basis of religion. 42 U.S.C. § 2000e-2. Religion includes "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's . . . religious observance or practice without undue hardship on the conduct of the employer's business." Id. § 2000e(j).

The First Circuit applies "a two-part framework in analyzing religious discrimination claims under Title VII." Sánchez-Rodríguez v. AT & T Mobility Puerto Rico, Inc., 673 F.3d 1, 12 (1st Cir. 2012). First, the plaintiff must make a "*prima facie* case that a bona fide religious practice conflicts with an employment requirement and was the reason for the adverse

employment action." Id. (quoting Cloutier v. Costco Wholesale Corp., 390 F.3d 126, 133 (1st Cir. 2004)) (internal quotation mark omitted). Second, once the plaintiff has established her *prima facie* case, the burden shifts to the employer to show that "it offered a reasonable accommodation *or* that a reasonable accommodation would be an undue burden." Id. (emphasis in original).

Neither party cited a case directly on point. In Chenzira v. Cincinnati Children's Hospital Medical Center, No. 1:11-cv-00917, 2012 WL 6721098, at *4 (S.D. Ohio Dec. 27, 2012), the court denied a hospital's motion to dismiss a terminated worker's Title VII religious discrimination claim. The employee had refused to take an influenza vaccine because of her veganism, and the court found "it plausible that [she] could subscribe to veganism with a sincerity equating that of traditional religious views." Id. The Chenzira court, however, was careful to state that its ruling "in no way addresses what it anticipates as Defendant's justification for its termination of Plaintiff, the safety of patients at Children's Hospital. At this juncture there simply is no evidence before the Court regarding what, if any, contact Plaintiff might have with patients, and/or what sort of risk her refusal to receive a vaccination could pose in the context of her employment." Id. at *5.

Other cases also have not squarely confronted an employer's Title VII obligations in light of mandatory influenza vaccination policies. In Virginia Mason Hospital v. Washington State Nurses Ass'n, 511 F.3d 908, 911 (9th Cir. 2007), a hospital implemented a mandatory influenza immunization regime as a fitness requirement for all nurses and other employees. The nurses' union filed a grievance and an arbitrator ordered that the mandatory immunization protocol be rescinded based on his interpretation of the collective bargaining agreement. Id. In light of the considerable deference for arbitral decisions and citing the "clearly established public policy

requiring employers to bargain with their union-represented employees over conditions of employment," the Ninth Circuit upheld the arbitrator's decision. Id. at 913, 917. In Edwards v. Elmhurst Hospital Center., No. 11-cv-4693-RRM-LB, 2013 WL 839535, at *4 (E.D.N.Y. Feb. 15, 2013), report and recommendation adopted, 2013 WL 828667 (E.D.N.Y. Mar. 6, 2013), the court dismissed a hospital worker's Title VII claim because he failed to allege any adverse employment action for his refusal of the influenza vaccination. In Zell v. Donley, 757 F. Supp. 2d 540, 541 (D. Md. 2010), where the plaintiff claimed that his employer violated Title VII for terminating him because he refused a vaccination for religious reasons, the court did not address the merits but held that the Title VII claims were equitably tolled.[2]

The Equal Employment Opportunity Commission ("EEOC") has offered general guidance on the issue. In an informal discussion letter responding to an unnamed party's inquiries, the EEOC's Office of Legal Counsel wrote that "[f]acts relevant to undue hardship" for a health care worker's request for an exemption from employer-mandated vaccinations "would presumably include, among other things, the assessment of the public risk posed at a particular time, the availability of effective alternative means of infection control, and potentially the number of employees who actually request accommodation."[3] The EEOC letter also

---

[2] In Head v. Adams Farm Living, Inc., 775 S.E.2d 904, 906 (N.C. Ct. App. 2015), a Seventh-Day Adventist alleged that her termination—for refusing to take the influenza vaccine—violated the state's public policy against religious discrimination, citing N.C. Gen. Stat. § 143–422.2. The Court of Appeals of North Carolina affirmed summary judgment for the defendant because that particular state statute, unlike Title VII, did not require employers to make a reasonable accommodation of their employees' religious beliefs. Id. at 909-10. In Friedman v. Southern California Permanente Medical Group, 125 Cal. Rptr. 2d 663, 666 (Cal. Ct. App. 2002), the plaintiff argued that his employer violated the California Fair Employment and Housing Act for discriminating against him because he refused a mumps vaccine. The court affirmed dismissing his claim because it concluded that veganism was not a religious creed under the state statute. Id. at 665.

[3] U.S. Equal Emp. Opportunity Comm'n, Informal Discussion Letter (Mar. 5, 2012), http://www.eeoc.gov/eeoc/foia/letters/2012/religious_accommodation.html.

addressed whether an employer that grants a religious accommodation excusing a health care worker from a mandatory vaccination may impose additional infection control practices on the worker, "such as wearing a mask."[4] The EEOC Office of Legal Counsel indicated that "such practices" could be imposed for legitimate, non-discriminatory reasons and whether the employer's motivation for imposing additional infection control measures was discriminatory or retaliatory "would turn on the facts of a given case."[5]

The Hospital argues that Robinson's claims fail for three independent reasons: (1) the Hospital reasonably accommodated Robinson; (2) any accommodation would have been an undue hardship; and (3) no reasonable jury could find that Robinson had a bona fide religious belief that precluded vaccination. D. 46 at 7-18. Because the Court concludes that the Hospital prevails on summary judgment on the first two grounds, it declines to address the third issue. As the Hospital acknowledges, D. 46 at 14, "assessing the bona fides of an employee's religious belief is a delicate business" and a "quintessential" question of fact. E.E.O.C. v. Unión Independiente de la Autoridad de Acueductos y Alcantarillados de Puerto Rico, 279 F.3d 49, 56-57 (1st Cir. 2002). "[T]hat no religious group espouses [the belief] or the fact that the religious group to which the individual professes to belong may not accept [the] belief will not determine whether the belief is a religious belief of the employee or prospective employee." 29 C.F.R. § 1605.1. And although inconsistencies between a person's conduct and her professed religious beliefs may suggest insincerity, they also may reflect "an evolution in [the person's] religious views." Unión Independiente, 279 F.3d at 57 & n.8. Accordingly, for summary judgment purposes, the Court assumes that Robinson can establish a *prima facie* case that her refusal to take the influenza vaccination is based on a sincerely held, bona fide religious belief.

---

[4] Id.

[5] Id.

### A. The Hospital Reasonably Accommodated Robinson

Title VII requires employers "to accommodate, within reasonable limits, the bona fide religious beliefs and practices of employees." Sánchez-Rodríguez, 673 F.3d at 12 (quoting Unión Independiente, 279 F.3d at 55) (internal quotation mark omitted). Claims of religious discrimination under Chapter 151B "ha[ve] been interpreted largely to mirror Title VII" claims. Cloutier, 390 F.3d at 131 (citing Mass. Gen. L. c. 151B, § 4(1A) that defines a reasonable accommodation as one that "shall not cause undue hardship in the conduct of the employer's business"). "[C]ases involving reasonable accommodation turn heavily upon their facts and an appraisal of the reasonableness of the parties' behavior." Id. (citation and internal quotation marks omitted). In analyzing whether an employer provided a reasonable accommodation, "a court should take a 'totality of the circumstances' approach and consider whether the *combination* of accommodations provided by the employer was reasonable." Id. at 12 (emphasis in original).

Importantly, "[b]y its very terms," Title VII directs that "any reasonable accommodation" by the employer is sufficient to meet its legal obligation. Ansonia Bd. of Educ. v. Philbrook, 479 U.S. 60, 68 (1986). An employee is "not entitled to any specific accommodation . . . , only a reasonable one." O'Brien v. City of Springfield, 319 F. Supp. 2d 90, 105 (D. Mass. 2003). To hold otherwise would give the employee "every incentive to hold out for the most beneficial accommodation" even where an employer offers a reasonable accommodation. Philbrook, 479 U.S. at 69. Finally, once the employer has reasonably accommodated the employee's religious needs, the inquiry is over. Id. at 68 (concluding that "where the employer has already reasonably accommodated the employee's religious needs, the statutory inquiry is at an end"). An employer

"need not further show that each of the employee's alternative accommodations would result in undue hardship." Id.

Courts have held that encouraging a plaintiff to transfer to another position within the company and offering her assistance toward that effort constitute a reasonable accommodation. For example, in Bruff v. Northern Mississippi Health Services, Inc., 244 F.3d 495, 499 (5th Cir. 2001), a counselor who worked for a non-profit hospital that provided counseling to employees from local businesses alleged religious discrimination under Title VII. A patient informed Bruff that she was a lesbian and requested counseling to improve her relationship with her partner. Id. at 497. Bruff declined to counsel the patient on her same-sex relationship, but offered to counsel her on other matters. Id. The patient complained, and Bruff explained to her employer that counseling gay patients about their relationships conflicted with her religious beliefs. Id. Bruff's employer determined that accommodating her request not to counsel on gay relationships was not feasible and placed her on leave without pay. Id. at 498. Her employer ultimately terminated her and a jury found in Bruff's favor. Id. at 499.

The Fifth Circuit reversed and held that Bruff's employer had reasonably accommodated her because it gave her thirty days and directed its in-house employment counselor to find another hospital position where the likelihood of further conflict with her religious beliefs would be reduced. Id. at 501. First, Bruff had declined to apply for any non-counselor positions or take tests that would have identified whether positions she did not consider would have been of interest. Id. at 499, 503. Second, although Bruff had applied to a counselor opening, her employer was not obligated to hire her for that position because a candidate with better credentials had applied. Id. at 498, 502. Third, Bruff did not apply when a second counselor position became available. Id. at 498, 502. The Fifth Circuit rejected Bruff's explanation—that

she did not apply because she believed her employer would not seriously consider her—as "pure speculation" and stressed that "[a]n employee has a duty to cooperate in achieving accommodation of his or her religious beliefs, and must be flexible in achieving that end." Id. at 503. Finally, although it was unclear from the record whether the employer's pastoral counseling department had an opening, the court faulted Bruff for failing to consider a transfer there because she speculated about a personal conflict with that department's director and refused to consider that option before the existence of a vacancy could be explored. Id. at 502-03.

In Walden v. Centers for Disease Control & Prevention, 669 F.3d 1277, 1294 (11th Cir. 2012), the Eleventh Circuit reached the same result on a record similar to Bruff. There, the court concluded that the employer had reasonably accommodated the plaintiff, who objected to counseling those in same-sex relationships, because the employer "encouraged her to obtain new employment with the company and offered her assistance in obtaining a new position." Id. The employer had no counseling positions in the Atlanta area, where the plaintiff was based, and the plaintiff did not apply for other positions. Id. That the employer should have considered "the most obvious accommodation"—transfer to a non-counseling position—was irrelevant. Id. (citation and internal quotation mark omitted). Her employer was "only obligated to offer her some reasonable accommodation," not her preferred accommodation. Id. (citing Philbrook, 479 U.S. at 68). The Eleventh Circuit also noted that the employer decided to lay her off rather than to terminate her, which allowed her to retain her tenure if the employer rehired her within a year. Id. at 1294-95.

Here, the Hospital employees worked with Robinson several times to address her objection to the vaccine. First, when Robinson told the Hospital that she allegedly had an

allergic reaction to a flu shot in 2007, the Hospital encouraged her to seek a medical exemption and granted her a temporary medical exemption while it reviewed her medical records. D. 47 ¶¶ 68-71. Second, the Hospital met with Robinson and permitted her to attempt to find a non-patient-area position so she would remain employed by the Hospital but be relieved of the mandatory vaccination policy. Id. ¶¶ 72-73. As part of that effort, the Hospital arranged an interview for her for a medical records clerk position, allowed Robinson to use her earned time-off on a nearly two-month leave of absence to search for employment with other employers and directed a human resources employee to assist Robinson's job search. Id. ¶¶ 74-75, 79-85. Third, when Robinson was unable to find another job by the end of her leave, the Hospital offered her an additional two weeks, which she accepted. Id. ¶ 90. Finally, when that two-week period ended, the Hospital deemed her termination a voluntary resignation to preserve her ability to re-apply for other Hospital positions in the future. Id. ¶ 91.

Robinson argues that the Hospital should have done more to help her find a new position at the Hospital. D. 50 at 6-8. Employers, however, are not obligated to create a position to accommodate an employee's religious beliefs. See Trans World Airlines, Inc. v. Hardison, 432 U.S. 63, 83 (1977) (stating that the employer "was not required by Title VII to carve out a special exception to its seniority system in order to help [the plaintiff] to meet his religious obligations"); Finnie v. Lee Cty., 907 F. Supp. 2d 750, 783-84 (N.D. Miss. 2012) (rejecting plaintiff's argument that her employer should have reasonably accommodated her by transferring her to another position; the record showed no open position for which she was qualified); see also Toronka v. Cont'l Airlines, Inc., 411 F. App'x 719, 725 (5th Cir. 2011) (stating that "precedent is plain that an employer is not required to create a new job type to accommodate a disabled employee" under the American with Disabilities Act ("ADA")); Hoskins v. Oakland

Cty. Sheriff's Dep't, 227 F.3d 719, 730 (6th Cir. 2000) (rejecting the plaintiff's reasonable accommodation argument under the ADA because "an employer's duty to reassign an otherwise qualified disabled employee does not require that the employer create a new job in order to do so").

As Robinson also acknowledges, other than the medical records position, she did not apply for anything else. D. 47 ¶ 89; D. 51-1 ¶ 89. Although the Hospital had a duty to accommodate her reasonably, Robinson also had a duty to cooperate. Philbrook, 479 U.S. at 69 (noting that "bilateral cooperation is appropriate in the search for an acceptable reconciliation of the needs of the employee's religion and the exigencies of the employer's business") (citation and internal quotation marks omitted); Bruff, 244 F.3d at 503; E.E.O.C. v. Caribe Hilton Int'l, 597 F. Supp. 1007, 1012 (D.P.R. 1984) (noting that under an employee's duty to cooperate, an employee is "entitled to refuse any offer of new employment or other accommodation if he so desires, but he simply, then, cannot claim that the [employer] has failed to satisfy his needs"). The Court concludes that the combination of the Hospital's efforts—allowing Robinson to seek a medical exemption, providing her reemployment resources, granting Robinson time to secure new employment and preserving her ability to return to the Hospital by classifying her termination as a voluntary resignation—amounted to a reasonable accommodation under Title VII and Chapter 151B.

### B.     Granting Robinson's Request Would Have Been an Undue Hardship

The Hospital argues that Robinson's claim must fail for a separate reason because granting her request—no vaccination while keeping her patient-care position—would have created an undue hardship. D. 46 at 11-14. An accommodation constitutes an undue hardship "if it would impose more than a *de minimis* cost on the employer." Cloutier, 390 F.3d at 134

16

(citing Hardison, 432 U.S. at 84). Undue hardship can be both "economic costs, such as lost business or having to hire additional employees to accommodate a Sabbath observer," and "non-economic costs, such as compromising the integrity of a seniority system" or loosening a company's dress code. Id. at 134-35 (concluding that to allow an employee to wear facial jewelry in violation of her employer's dress code despite her religion's promotion of piercings is an undue hardship because the employer loses control over its public image). Undue hardship can also exist if the proposed accommodation would "either cause or increase safety risks or the risk of legal liability for the employer." E.E.O.C. v. Oak-Rite Mfg. Corp., No. 99-cv-1962-DFH, 2001 WL 1168156, at *10 (S.D. Ind. Aug. 27, 2001). "Title VII does not require employers to test their safety policies on employees to determine the minimum level of protection needed to avoid injury." Id. at *14.

In Bhatia v. Chevron U.S.A., Inc., 734 F.2d 1382, 1383 (9th Cir. 1984), Chevron adopted a policy to comply with state occupational safety standards. The policy required all employees with potential exposure to toxic gases, including all machinists like the plaintiff, to shave any facial hair that prevented a tight face-seal when wearing a respirator. Id. The plaintiff informed Chevron that he could not comply with its policy because his religion forbids cutting or shaving any body hair. Id. Chevron suspended the plaintiff without pay and sought to find him another job. Id. After going back and forth about alternative jobs, the plaintiff ultimately accepted a lower-paying job with different responsibilities. Id.

The Ninth Circuit held that Chevron had established that retaining the plaintiff as a machinist unable to use a respirator would have imposed an undue hardship. Id. To require Chevron to retain the plaintiff as a machinist without a respirator would have forced Chevron to revamp its duty assignments to accommodate whether particular assignments led to potential

toxic exposure. Id. at 1384. The plaintiff's coworkers also would have been required "to assume his share of potentially hazardous work." Id. "Title VII does not require Chevron to go so far." Id.

In Kalsi v. New York City Transit Authority, 62 F. Supp. 2d 745, 747-48 (E.D.N.Y. 1998), aff'd, 189 F.3d 461 (2d Cir. 1999), the transit authority fired the plaintiff because he refused to wear a hard hat while working as a subway car inspector. The plaintiff, however, alleged that, as a matter of religion, he could not cover his turban and sued for religious discrimination under Title VII. Id.

The court held that accommodating the plaintiff's desire to be hat-free constituted an undue hardship and granted summary judgment against him. Id. at 759. First, the plaintiff's recommendations to make the work safe for him were "significant modifications" at a cost that could not be described as *de minimis*. Id. at 759. Second, the transit authority faced "substantial" "potential costs" if the plaintiff suffered from a catastrophic injury from being hat-free. Id. at 760. Third, the potential for injury extended to other employees as well because car inspectors did not work alone. Id. To have the transit authority bear that risk was an undue burden. Id. Finally, to allow the plaintiff to take unpaid breaks when his work shifted to hat-requiring tasks would be "unworkable," because "the great majority" of an inspector's tasks required a hard hat and the proposal would require a full-time substitute to be immediately available to replace him. Id.

The Hospital contends that granting Robinson's request would have been an undue hardship because it would have increased the risk of transmitting influenza to its already vulnerable patient population. D. 46 at 13-14. On this record, the Court agrees. Health care employees are at high risk for influenza exposure and can be source of the fatal disease because

18

of their job. D. 47 ¶¶ 5-6. Numerous medical organizations support mandatory influenza vaccination for health care workers. Id. ¶¶ 14-16. The medical evidence in this record demonstrates that the single most effective way to prevent the transmission of influenza is vaccination. Id. ¶ 7; Virginia Mason Hosp., 511 F.3d at 913 (noting "the impressive list of health authorities and experts who recommend that health care workers be immunized because they are in a highly contagious environment and deal with patients who are at high risk of contracting the flu"). In the same vein, the Department requires all licensed state hospitals to provide the influenza vaccine to their employees at no cost and to report their compliance.[6] D. 47 ¶¶ 8-11; 105 C.M.R. § 130.325(E), (I).

Here, in light of the state's requirements and the Hospital's understanding of the medical consensus on influenza vaccination, the Hospital decided to achieve the safest possible

---

[6] The Court is aware that 105 C.M.R. § 130.325(F)(1) provides that a hospital "shall not require an employee to receive an influenza vaccine . . . if: (a) the vaccine is medically contraindicated, which means that administration of influenza vaccine to that individual would likely be detrimental to the individual's health; (b) vaccination is against the individual's religious beliefs; or (c) the individual declines the vaccine." Robinson does not assert a claim based on 105 CMR § 130.325 and the regulation does not affect the Court's analysis of the Hospital's Title VII liability. As discussed above, Title VII protects an employee from religious discrimination but permits an employer's policy if the employer offers a reasonable accommodation or demonstrates that such accommodation would create an undue hardship. Cloutier, 390 F.3d at 133.

The Court is also aware that DPH announced proposed amendments to 105 CMR § 130.325 in November 2014. In a memorandum explaining the amendments, DPH recognized "that there is still some confusion regarding whether a facility may adopt a more stringent requirement (i.e., require its workers to receive an annual influenza vaccination without an exception for voluntary declinations). [DPH] is proposing to amend the existing language to make explicit that a facility may do so—in other words, that the regulations do not prohibit a widespread mandate at the option of each facility." Memorandum from Madeleine Biondolillo, M.D., Associate Commissioner (Nov. 12, 2014), at 3, http://www.mass.gov/eohhs/docs/dph/legal/hcw-immunization/phc-memo-nov-12-2014.doc. As a result, one amendment seeks to add the following language to 105 C.M.R. 130.325(F): "Nothing in [the regulation] precludes a hospital from requiring all personnel to receive vaccination for influenza." Proposed Changes, at 2, http://www.mass.gov/eohhs/docs/dph/legal/hcw-immunization/proposed-amendments-105-cmr-130.docx.

environment for its patients. D. 47 ¶ 17. With the exception of those with medical issues, the Hospital sought as close to total compliance as possible by requiring all persons who work in or access patient-care areas to be vaccinated. D. 47 ¶¶ 18-19. Robinson worked in a patient-care area. D. 47 ¶¶ 24-25; D. 51-1 ¶¶ 24-25. She worked closely with patients, regularly sitting near or touching them as she worked on their admission to the Hospital. D. 47 ¶¶ 28-29; D. 51-1 ¶¶ 28-29. Had the Hospital permitted her to forgo the vaccine but keep her patient-care job, the Hospital could have put the health of vulnerable patients at risk. To allow Robinson to avoid relatively more vulnerable patients and not others would have been unworkable as well. It would have forced the Hospital to arrange its work flow around uncertain factors. Bhatia, 734 F.2d at 1384. On this record, accommodating Robinson's desire to be vaccine-free in her role would have been an undue hardship because it would have imposed more than a *de minimis* cost.[7] Cloutier, 390 F.3d at 134.

## VI. Conclusion

For the foregoing reasons, the Court ALLOWS the Hospital's motion for summary judgment, D. 45.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge

---

[7] "Although the Massachusetts undue hardship standard [under Mass. Gen. L. c. 151B] is 'notably different' and allows for slightly broader religious protection, the two share substantial common ground." Massachusetts Bay Transp. Auth. v. Massachusetts Comm'n Against Discrimination, 450 Mass. 327, 337 (2008) (quoting Pielech v. Massasoit Greyhound, Inc., 441 Mass. 188, 196 (2004)). The Massachusetts statute's "list of circumstances that constitute undue hardship" recognizes "a compromise of the health and safety of the public." Brown v. F.L. Roberts & Co., 452 Mass. 674, 684 (2008) (citing Massachusetts Bay Transp. Auth., 450 Mass. at 336); Mass. Gen. L. c. 151B § 1A. For the same reasons stated above, Robinson's state law claim fails as well.